# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
### CENTRAL DIVISION

JEAN HINESLEY,     )
            )
    Plaintiff,    )
            )
   v.       )  Case No. 08-04294-CV-C-NKL
            )
CITY OF LAKE OZARK, MISSOURI, )
POLICE DEPARTMENT OF LAKE  )
OZARK, MISSOURI, BRETT BRAUN and )
TONYA LLOYD      )
            )
    Defendants.

## ORDER

Plaintiff Jean Hinesley ("Hinesley") brings this action under 42 U.S.C. § 1983 against Defendants  City of Lake Ozark, Missouri, Police Department of Lake Ozark, Missouri, and Brett Braun ("Braun")  and Tonya Lloyd ("Lloyd") in their individual and official capacities as police officers employed by the Police Department of Lake Ozark, Missouri.  Before the Court are Defendants Braun and Lloyd's Motion to Strike [Doc. # 90], Defendant Braun's Motion for Partial Summary Judgment [Doc. # 83], and Defendants City of Lake Ozark and Lloyd's Motions for Summary Judgment [Docs. ## 79, 81].  Defendants Braun and Lloyd's Motion to Strike is GRANTED, Defendant Braun's Motion for Partial Summary Judgment is GRANTED, Defendant Lloyd's Motion for Summary Judgment is GRANTED in part and DENIED in part, and Defendant City of Lake Ozark's Motion for

Summary Judgment is GRANTED.

## I.  Factual Background[1]

On December 4, 2006, Officer Braun was dispatched to Plaintiff Hinesley's neighborhood after it was reported that someone had left the scene of an accident.  Upon arriving at the scene, Officer Braun observed a vehicle parked on the street directly across from Plaintiff's driveway.  The parties dispute the extent – but not the existence – of the damage to the vehicle, whether Officer Braun observed tracks in the snow leading from the point of impact to the Plaintiff's driveway, and whether the Blazer parked in Plaintiff's driveway had sustained damage, marks, or wear on its right rear bumper.   However, it is undisputed that Plaintiff's neighbors informed Braun that they suspected Plaintiff had caused the damage to the parked vehicle.

While inspecting Plaintiff's Blazer, Officer Braun spoke first with Plaintiff's husband, John Hinesley ("Mr. Hinesley").   Officer Braun believed Mr. Hinesley was intoxicated, and Mr. Hinesley had, in fact, been drinking alcohol before his interaction with Braun.  Mr. Hinesley informed Officer Braun that the Blazer in the driveway belonged to his wife, Plaintiff Jean Hinesley.  Officer Braun asked to speak with Plaintiff, and Mr. Hinesley went inside the residence to get her.  Mr. Hinesley initially remained inside the residence, and Plaintiff Hinesley came outside to speak with Officer Braun.

Plaintiff Hinesley denied having been involved in the accident Officer Braun was

_____

[1]The Court has considered the parties' statements of undisputed fact which are supported by evidence.  In considering each party's motion, the Court has drawn all inferences in favor of the non-movant.

2

investigating and demanded an explanation as to Officer Braun's presence in her driveway. Officer Braun asked Plaintiff numerous times to produce identification. Plaintiff went back inside her residence to retrieve her identification. When Plaintiff came back outside, Officer Braun again asked for Plaintiff's identification. Plaintiff did not produce the identification but repeated her requests for an explanation. Officer Braun informed Plaintiff Hinesley that he would arrest her if she did not produce her identification. Officer Braun then arrested Plaintiff Hinesley. Lake Ozark City Code § 205.310 provides as follows: "It is hereby declared unlawful for any person to willfully fail or refuse to comply with any lawful order or direction of any City Police Officer."

In response to Officer Braun's request for her to bring a measuring tape to the scene, Officer Tonya Lloyd subsequently arrived at Plaintiff's residence along with her husband, Officer Randy Lloyd. Defendant Tonya Lloyd's back was turned and she was still standing in the street during the time that Plaintiff alleges that Defendant Braun threw her to the ground. Defendant Lloyd overheard yelling and observed Braun and Plaintiff Hinesley on the ground in the driveway. While Officer Braun was taking Plaintiff into custody, Mr. Hinesley re-emerged from the residence. Defendant Lloyd directed her attention to Mr. Hinesley, whom she intercepted and arrested as he yelled at the officers that were arresting his wife, Plaintiff Hinesley. During the entire incident, Officer Tonya Lloyd never physically touched Plaintiff.

One month prior to the incident in question, on November 4, 2006, while acting in his capacity as a reserve deputy for the Miller County Sheriff's Office, Officer Braun

conducted a traffic stop in the parking lot of a restaurant and bar in Miller County called the Red Oak Inn. In connection with this traffic stop, Deputy Colin Murdick of the Cole County Sheriff's Office issued a probable cause statement charging Officer Braun with assault and false imprisonment. Officer Braun's commission was subsequently revoked by the Miller County Sheriff. Criminal charges were filed against Officer Braun in November 2007, alleging he used excessive force in the incident at the Red Oak Inn. Officer Braun was later acquitted by a Moniteau County associate circuit judge, who found that the force used by Braun was not excessive. [Doc. # 82, Ex. J.]

The City of Lake Ozark received several complaints from the public, coworkers, and the city administration regarding Braun's attitude during the time he worked as a dispatcher from December 2002 until he resigned in October 2004. Braun was commissioned as a police officer for the City of St. Robert on November 8, 2004. Officer Braun's supervisor at the St. Robert Police Department described Braun as "antagonistic," citing continuous complaints from the public. [Doc. # 89, Ex. 24.] A formal complaint was filed regarding an incident on May 21, 2005, in which Officer Braun drew a gun on Bradley Shackleford while Shackleford was reaching for his cell phone. In June 2005, Jennifer Dupuis filed a formal complaint against Officer Braun, claiming to have been continually harassed by Braun over a seven-month period. According to Dupuis's complaint, during a traffic stop on June 19, 2005, Braun threatened to arrest her because she had not yet provided her identification, then grabbed her hair, yanked her out of the car, and threw her down to the ground. Finally, in September 2005, Jessica Simons filed a formal complaint against

Officer Braun, accusing him of using his nightstick to abuse the animals at her place of business, Nicole's World of Pets. Braun continued to be employed as a police officer for the City of St. Robert until he resigned in May 2006, when he was hired as a reserve officer at City of Lake Ozark. Defendants Braun and Lloyd had both attended a training academy and both held a class A certification with the Missouri Department of Public Safety, indicating that they had received at least 470 hours of training.

## II. Discussion

### A. Defendants' Motion to Strike

Pursuant to Fed. R. Civ. P. 37, Defendants move to strike two affidavits attached as exhibits to Plaintiff's Opposition to Defendants' Motions for Summary Judgment: Affidavit of Paul Garrison [Doc. # 89, Ex. 21] and Affidavit of Carol Colvin [Doc. # 89, Ex. 22]. Plaintiff did not respond to Defendants' Motion to Strike. The Court grants Defendants' Motion to Strike for the reasons below.

Under the Federal Rules of Civil Procedure, parties are required to initially disclose "the name and, if known, the address and telephone number of each individual likely to have discoverable information . . . the disclosing party may use to support its claims or defense, unless the use would be solely for impeachment." Fed. R. Civ. P. 26(a)(1)(A). Each party has a duty to supplement its disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect," as long as such additional information has not already been made known to the other parties during the discovery process. Fed. R. Civ. P. 26(e)(1)(A). "If a party fails to provide information or

identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . unless the failure was substantially justified or harmless." Fed. R. Civ. P. 37(c)(1).

Here, the Plaintiff, in her Opposition to Defendants' Motions for Summary Judgment, relied on two affidavits of witnesses who were not properly disclosed under Rule 26(a) or (e). Defendants claim that the failure to disclose these two witnesses – Paul Garrison and Carol Colvin – has not been substantially justified. Defendants also claim that the failure to disclose was harmful because "Defendants have conducted discovery based upon Plaintiff's disclosures and prepared dispositive motions based upon Plaintiff's case as it was known to them at the close of discovery." [Doc. # 90 at 3.]

In the absence of a response from Plaintiff, there is no evidence that the failure to disclose the witnesses was substantially justified. The Court also finds that the failure to disclose the witnesses was harmful because the Defendants did not have the opportunity to depose the witnesses or consider their testimony in preparing their dispositive motions. Therefore, the Court grants the Defendants' Motion to Strike the affidavits of Paul Garrison and Carol Colvin. The Court declines to award attorneys fees in its discretion under Rule 37(c)(1)(A).

### B.  Summary Judgment Standard

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(c). The moving party "bears the initial responsibility of informing the district court of the basis for its motion" and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, Rule 56(e) requires the non-moving party to respond by submitting evidentiary materials that designate "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, a district court must look at the record and any inferences to be drawn from it in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* at 248.

### C. Defendant Braun's Motion for Partial Summary Judgment

Plaintiff Hinesley asserts a § 1983 claim against Defendant Braun, alleging that Braun's arrest of Plaintiff was in violation of the Fourth Amendment and that Braun used excessive force in effecting the arrest. Defendant Braun concedes for purposes of this motion that Plaintiff's allegations against him are sufficient to create issues of material fact as to the level of force used to effect Plaintiff's arrest. However, Defendant Braun claims that the uncontroverted facts demonstrate that he was justified under the Fourth Amendment in arresting Plaintiff when she failed to produce her identification. Setting aside the issue of Officer Braun's level of force, the Court finds that, as a matter

of law based on the uncontroverted facts, Officer Braun's arrest of Plaintiff Hinesley was lawful because: (1) Officer Braun had the requisite reasonable suspicion to engage Plaintiff in a *Terry* stop, (2) Officer Braun's request for identification was reasonably related to the circumstances justifying the stop, and (3) Officer Braun had probable cause to arrest Plaintiff for her failure to comply with a lawful order.

The first issue is whether Officer Braun had the requisite reasonable suspicion to engage Plaintiff in a *Terry* stop. "Reasonable suspicion" is "a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). "The officer must be able to articulate more than an 'inchoate and unparticularized suspicion or "hunch" of criminal activity.'" *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)).

Here, there is no genuine issue of material fact regarding whether Officer Braun had more than an inchoate and unparticularized suspicion or mere hunch. It is undisputed that Plaintiff's neighbors informed Officer Braun that they suspected Plaintiff had caused the alleged damage to the parked vehicle. [Doc. # 83, Ex. B, ¶ 19.] Moreover, the parties do not dispute that Officer Braun observed a damaged vehicle parked directly across from Plaintiff's driveway. [Doc. # 83, Ex. B, ¶ 28.] When Braun inspected the Blazer in the Plaintiff's driveway, Mr. Hinesley, apparently intoxicated, informed Braun that it belonged to his wife, Plaintiff Hinesley. [Doc. # 83, Ex. B, ¶ 39.] Therefore, there is no genuine issue of material fact regarding Officer Braun's reasonable suspicion that Plaintiff was involved with the hit-and-run accident outside her

8

home.  As a matter of law, Officer Braun's *Terry* stop was legally justified.

The next issue is whether Officer Braun's request for identification was reasonably related to the circumstances justifying the stop.  Where a police officer has a "reasonable suspicion" justifying a *Terry* stop, state law does not violate the Fourth or Fifth Amendment by requiring that the individual identify herself.  *Hiibel v. Sixth Judicial Dist. Court of Nev.*, 542 U.S. 177, 178 (2004).  However, under the principles set forth in *Terry*, "an officer may not arrest a suspect for failure to identify himself if the request for identification is not reasonably related to the circumstances justifying the stop."  *Hiibel*, 542 U.S. at 188.  In *Hiibel*, Justice Kennedy wrote that "[t]he request for identity has an immediate relation to the purpose, rationale, and practical demands of a *Terry* stop."  *Hiibel*, 542 U.S. at 188.  Under the facts in *Hiibel*, the officer's request for identification "was a commonsense inquiry, not an effort to obtain arrest for failure to identify after a *Terry* stop yielded insufficient evidence."  *Id.*

Here, Officer Braun made a commonsense inquiry to verify the identity of the person with whom he spoke, even before he began substantive questioning.  Given Officer Braun's reasonable suspicion that the Plaintiff was linked to the alleged crime, Officer Braun was entitled to request her identity.  Officer Braun's request that Plaintiff produce a driver's license was reasonable not only as the standard means of identification, but also to verify that she had a valid license to operate a vehicle.  After all, Braun was investigating a driving offense and the Plaintiff's husband had identified her as the owner of the vehicle toward which Braun's reasonable suspicion was directed.

Therefore, there is no genuine issue of material fact regarding the lawfulness of Officer Braun's request for Plaintiff's identification. Braun's request for identification was reasonably related to the circumstances justifying the *Terry* stop.

The final issue is whether Officer Braun had probable cause to arrest Plaintiff when he did under § 205.310 of the City of Lake Ozark Code, which provides: "It is hereby declared unlawful for any person to willfully fail or refuse to comply with any lawful order or direction of any City Police Officer." Probable cause deals with non-technical probabilities – "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States*, 338 U.S. 160, 175 (1949). Probable cause for arrest exists where the facts and circumstances within police officers' knowledge, and of which they had reasonably trustworthy information, are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed. *Id.* at 175-76.

Here, Plaintiff claims that she "never refused to show Braun her identification." [Doc. # 89, ¶ 25.] Defendants, however, do not claim that Plaintiff refused to show Officer Braun her identification, only that she failed to show him her identification. The parties do not dispute that Braun requested numerous times that Plaintiff produce her identification, that Braun finally threatened to arrest her if she did not produce her identification, and that Plaintiff had not produced her identification at the time of arrest.

According to the Plaintiff's own testimony, when Plaintiff first encountered Officer Braun, she responded to his requests for identification by demanding an

explanation:

> I don't understand, I said, I'm just asking what you're doing. I said, you're in my driveway lurking around my Blazer with a flashlight, and I would like to know what's going on. And he . . . asked for my ID. And I said, well, can't I just tell you my name? And he yelled, no. And he said, I need to see your ID. And I said, well, I don't understand. I'm simply trying to find out what's going on. . . . And he said to go get my ID, and so I asked him, I said, I just don't understand. I said, I will, I said, but can't I just give you my name? And he said, no, I need to see your ID. I said, okay, and I said, I don't understand. I said, what, I said, did they, and I pointed like that to the neighbors, meaning them, the neighbors, I said, did they tell you I hit that car or something? . . . And he yelled at me to just go get my ID.

[Doc. # 80, Ex. 8 at 53-54.] At this point – after Officer Braun had requested the Plaintiff's identification five times according to her testimony – Plaintiff went inside to retrieve her ID. Plaintiff testifies that when she re-emerged:

> I had my ID in my hand. I had it in my pocket. I went back out and I asked him again, I said, would you please just explain to me what's going on here? I said, I'm just simply asking what's going on. And he said, just give me your ID. And I said, well, I will, I said, but I just don't understand. I'm simply asking what is going on. I'd like to know. I don't understand. And he yelled out and he said, that's it . . . if you don't give me your ID right now, he said, you'll be under arrest.

*Id.* By Plaintiff's own testimony, Officer Braun requested her identification a total of seven times before he arrested her. While Plaintiff is correct in noting that the officer in *Hiibel* requested the identification of the suspect there eleven times, there is no requirement that an officer must request a suspect's identification more than ten times before finding probable cause that the suspect is willfully failing to comply with a lawful order. *Hiibel*, 542 U.S. at 180.

There is no genuine issue of material fact regarding the lawfulness of Officer

Braun's decision to arrest Plaintiff for willful failure to comply with a lawful order.

Braun's decision to arrest Plaintiff was legally justified. Therefore, the Court grants

Defendant Braun's Motion for Partial Summary Judgment. As mentioned above, the

Court does not reach the issue of whether Braun effected the arrest with excessive force.

### D. Defendant Lloyd's Motion for Summary Judgment

Defendant Lloyd argues that she is entitled to judgment as a matter of law regarding

her role in the alleged excessive use of force in Plaintiff's arrest. With respect to

Plaintiff's § 1983 claim, the Court finds that Officer Lloyd has not met her burden of

demonstrating that there is no genuine issue of material fact such that no reasonable jury

could return a verdict against her. With respect to Plaintiff's state law battery claim

against Officer Lloyd, the Court grants summary judgment.

First, with regard to Plaintiff's § 1983 claim, Defendant Lloyd argues that she is

entitled to qualified immunity. According to the Eighth Circuit:

> The test for whether an officer is entitled to qualified immunity is twofold:
> (1) whether the facts alleged, taken in the light most favorable to the injured
> party, show that the officer's conduct violated a constitutional right; and (2)
> whether the constitutional right was clearly established at the time of the
> deprivation so that a reasonable officer would understand his conduct was
> unlawful.

*Nance v. Sammis*, 583 F.3d 604, 612 (8th Cir. 2009) (citing *Pearson v. Callahan*, 129 S.

Ct. 808, 815-16 (2009)).

Under Eighth Circuit precedent, the right to be "free from excessive force in the

context of an arrest is a clearly established right under the Fourth Amendment's prohibition against unreasonable seizures." *Samuelson v. City of New Ulm*, 455 F.3d 871, 877 (8th Cir. 2006). "As of July 2006," when the arrest in *Krout v. Goemmer* occurred, "it was clearly established that a state actor may be liable for an unreasonable seizure under the Fourth Amendment if he fails to intervene to prevent the unconstitutional use of excessive force by another official." *Krout v. Goemmer*, 583 F.3d 557 (8th Cir. 2009).

Here, the arrest in question occurred on December 4, 2006. Therefore, the constitutional right to be free from excessive force in the context of an arrest, as between Plaintiff Hinesley and Officer Lloyd, was clearly established in the Eighth Circuit at the time of the arrest.

Under the *Nance* twofold inquiry, the remaining issue is whether the facts alleged, taken in the light most favorable to Plaintiff Hinesley, show that Officer Lloyd's conduct violated a constitutional right. In the context of a § 1983 claim alleging a police officer's failure to intervene, the Eighth Circuit in *Nance* adopted the following test to determine the witnessing officer's liability under the Fourth Amendment:

> A police officer who *fails* to act to prevent the use of excessive force may still be held liable where (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring.

*Nance*, 583 F.3d at 612 (quoting *Floyd v. City of Detroit*, 518 F.3d 398, 406 (6th Cir. 2008)). Thus, for Officer Lloyd to prevail on her Motion for Summary Judgment, she must show that there is no genuine issue of material fact regarding (1) whether she observed or had reason

to know that excessive force would be or was being used by Officer Braun to effect Plaintiff's arrest, or (2) whether she had both the opportunity and the means to prevent the harm from occurring.

Defendant Lloyd is correct in contending that, contrary to Plaintiff's assertions, "[t]here is no evidence 'Defendant [Tonya] Lloyd was standing, kneeling, or leaning over Officer Braun to assist with the arrest.'" [Doc. # 91 at 19, quoting Doc. # 89 at 23.] Such conjecture is unsupported by the record and insufficient to create a dispute as to a material fact. *Bloom v. Metro Health Group of St. Louis, Inc.*, 440 F.3d 1025, 1028 (8th Cir. 2006).

Nonetheless, taking the facts properly alleged in the light most favorable to Plaintiff, Defendant Lloyd has not carried her burden to show that there is no genuine issue of material fact regarding her liability under the Fourth Amendment. First, the record reveals a genuine issue of material fact regarding whether Defendant Lloyd observed or had reason to know that excessive force was being used by Officer Braun to effect Plaintiff's arrest. According to Plaintiff's deposition:

> That's when [Defendant Tonya Lloyd and Officer Randy Lloyd] turned around and looked, when I started screaming for help, and John [Hinesley] came out of the house. Tonya Lloyd walked over into my driveway and didn't do anything to stop Braun. She told my husband to go back in the house, turn around and go back in the house. And he said, what do you mean? He said, he's beating my wife.

[Doc. # 80, Ex. 8 at 66-67.] Taking these alleged facts in the light most favorable to Plaintiff Hinesley, a reasonable jury could find that Officer Lloyd observed or had reason to know that the alleged excessive force was being used by Officer Braun.

Second, the record reveals a genuine issue of material fact regarding whether Officer Lloyd had both the opportunity and the means to prevent the harm from occurring. According to Defendant Lloyd's deposition:

> Q:      So as you approached Officer Braun and Jean Hinesley both on the ground, did you try to assist him in effecting the arrest or –
> A:      Not him. No, I did not. . . . When I walked up and you saw that, [Officer] Randy [Lloyd] was right behind me. . . . I saw a man coming out of the house. And I looked over, and Randy was going to assist Brett. And so I went and made contact with the male coming out of the house.

[Doc. # 80, Ex. 4 at 14.] Even considering Defendant Lloyd's own testimony, a reasonable jury could find that she had the opportunity and the means to prevent the alleged harm from occurring.

Defendant Lloyd cites an Eleventh Circuit opinion for the proposition that the law did not "impose a duty on Officer Loyd [sic] to abandon her attempt to subdue one suspect in order to protect another suspect against whom excessive force was being used." [Doc. # 80 at 15 (citing *Ensley v. Soper*, 142 F.3d 1402, 1407 (11th Cir. 1998)).] However, *Ensley* found only that an officer has no "duty to abandon his attempt to arrest one armed attacker in order to protect another armed attacker against whom other officers may be using excessive force." *Ensley*, 142 F.3d at 1407. Unlike in *Ensley*, neither Plaintiff Hinesley nor her husband are alleged to have been either "armed" or "attack[ing]" the police officers. According to Defendant Lloyd's own deposition testimony, Mr. Hinesley was "walking up and down the sidewalk and wanting to go down the stairs to [Officer Braun and Plaintiff Hinesley]. And I had to, you know, keep saying, no, you can't go down. Stay back here." [Doc. # 80, Ex. 4

15

at 19.] A reasonable jury could conclude that Mr. Hinesley did not pose a danger great enough to distract Officer Lloyd from intervening to prevent the excessive force allegedly used to effect Plaintiff's arrest.

Taking all of the alleged facts on the record in the light most favorable to Plaintiff Hinesley, a reasonable jury could find that Officer Lloyd had the opportunity and the means to intervene in the arrest to prevent Officer Braun from allegedly harming Plaintiff. Defendant Lloyd's Motion for Summary Judgment is denied with respect to Plaintiff's § 1983 claim against her.

Plaintiff also asserts a state law battery claim against Officer Lloyd. Under Missouri law, "[b]attery is defined as an intended, offensive bodily contact with another." *Phelps v. Bross*, 73 S.W.3d 651, 656 (Mo. App. 2001). It is undisputed that Officer Lloyd never made bodily contact with Plaintiff during the entire encounter. There is no genuine issue of material fact regarding the battery claim and Defendant Lloyd is entitled to a judgment as a matter of law. Defendant Lloyd's Motion for Summary Judgment is granted with respect to Plaintiff's state law battery claim.

### E. Defendant City of Lake Ozark's Motion for Summary Judgment

Plaintiff's Complaint alleges liability for "failures to train, instruct, supervise, control and discipline the individual law enforcement officers on a continuing basis." [Doc. # 1 at ¶ 24.] According to the Complaint, such failures "were the result of official policy and/or the customs, practices, usages of the defendant government entities" as well as "the result of the deliberate indifference of the policy makers toward the rights of the citizens and Plaintiff."

*Id.* In response, Defendant City of Lake Ozark moves for summary judgment.

Interpreting the text of § 1983, the Supreme Court has held that local governments cannot be held liable under a theory of *respondeat superior* but can only be held liable when the constitutional deprivation arises from a governmental policy or custom. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). The Eighth Circuit "has held municipalities liable under *Monell* when the plaintiffs have produced evidence of prior complaints sufficient to demonstrate that the municipalities and their officials ignored police misconduct." *Mettler v. Whitledge*, 165 F.3d 1197, 1205 (8th Cir. 1999) (citations omitted). However, where a plaintiff asserts that the local government has not directly inflicted the injury but has caused an employee to do so, "rigorous standards of culpability and causation must be applied to ensure that the [municipality] is not held liable solely for the actions of its employee." *Bd. of the County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 405 (1997). "In enacting § 1983, Congress did not intend to impose liability on a municipality unless *deliberate* action attributable to the municipality itself is the 'moving force' behind the plaintiff's deprivation of federal rights." *Id.* at 400 (quoting *Monell*, 436 U.S. at 694).

In conducting a *Monell* analysis, the Eighth Circuit does not use the terms "policy" and "custom" interchangeably. *Mettler*, 165 F.3d at 1204. A "policy" is "an official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." *Id.* As in *Mettler*, Plaintiff Hinesley has not identified any official policy that arguably played a role in the alleged use of excessive force.

Therefore, the Court must determine whether Plaintiff has come forward with evidence

from which a jury could reasonably find the existence of a relevant municipal custom. *Id.*

To prove the existence of a municipal "custom," or "practice," Plaintiff must satisfy three

requirements:

> (1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;
> (2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and
> (3) That plaintiff was injured by acts pursuant to the governmental entity's custom, *i.e.*, that the custom was the moving force behind the constitutional violation.

*Jane Doe A v. Special Sch. Dist.*, 901 F.2d 642, 646 (8th Cir. 1990). For the reasons that

follow, the Court finds that the Plaintiff has not produced sufficient evidence from which a

jury could reasonably find the existence of a relevant municipal custom revealing the City of

Lake Ozark's deliberate indifference toward the rights of Plaintiff Hinesley.

### 1. Failure to Train or Instruct

Plaintiff's Complaint first alleges liability under § 1983 for failures to train and

instruct. [Doc. # 1 at ¶ 24.] The Supreme Court has held that a failure to train theory could

be the basis for § 1983 liability only in limited circumstances where the failure to train

amounts to deliberate indifference to the rights of persons with whom the police come into

contact. *City of Canton v. Harris*, 489 U.S. 378, 387-88 (1989). In *Bryan County,* the

Supreme Court further explained that in *City of Canton* it had spoken "of a deficient training

'program,' necessarily intended to apply over time to multiple employees. Existence of a

'program' makes proof of fault and causation at least possible in an inadequate training case."

*Bryan County*, 520 U.S. at 407. Over time, "[i]f a program does not prevent constitutional violations, municipal decisionmakers may eventually be put on notice that a new program is called for." *Id.*

Under Eighth Circuit precedent, a local government may be held liable for failure to properly train its employees if the local government was on notice of its inadequate training. *See Larkin v. St. Louis Hous. Auth. Dev. Corp.*, 355 F.3d 1114, 1117 (8th Cir. 2004). However, in *Larkin*, the Eighth Circuit was concerned with the Defendant Housing Authority's training policy, not with how the Defendant security guard absorbed the training. *Id. Larkin* cited the language of the Supreme Court in *City of Canton*: "That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *City of Canton*, 489 U.S. at 390-91.

Here, Defendants Braun and Lloyd had both attended a training academy and held a class A certification with the Missouri Department of Public Safety, indicating that they had received at least 470 hours of training. Plaintiff Hinesley does not allege any general inadequacy in the Police Department of Lake Ozark's training requirements. Instead, Plaintiff argues that City of Lake Ozark policymakers were deliberately indifferent to the need to provide additional training or restrictions on Braun's use of force. [Doc. # 89 at 27.] Under a failure to train theory, the Court is concerned with the Defendant's training policy, not with how Officer Braun absorbed the training. Even assuming that the City of Lake Ozark was on notice that Officer Braun had not absorbed the training, Plaintiff has adduced no evidence to

suggest that the City of Lake Ozark had instituted a policy or custom amounting to deliberate indifference in its failure to train its officers and constituting the moving force that caused the Plaintiff's alleged injuries. Accordingly, the Court grants summary judgment with respect to Plaintiff's failure to train theory.

## 2. Failure to Supervise, Control, or Discipline

Plaintiff's Complaint also alleges liability under § 1983 for failures to supervise, control and discipline individual law enforcement officers. [Doc. # 1 at ¶ 24.] Federal courts have generally considered § 1983 claims of failure to supervise or control when the claim is against supervisory officials. *See*, *e.g.*, *Brockinton v. City of Sherwood, Ark.*, 503 F.3d 667, 673 (8th Cir. 2007); *Otey v. Marshall*, 121 F.3d 1150, 1155 (8th Cir. 1997); *Sims v. Adams*, 537 F.2d 829 (5th Cir. 1976); *Poe v. Haydon*, 853 F.2d 418, 429 (6th Cir. 1998). Here, Plaintiff has not sued any supervisory officials. Even if such failure to supervise or control claims were proper as alleged against a governmental entity, the analysis would not materially differ from the failure to discipline analysis laid out below. *See Plemons v. Amos*, 2006 WL 1710415, at *3 (N.D. Tex. June 22, 2006) ("Alleged failures to control and discipline are a failure to supervise.").

It appears from her Opposition to Defendants' Motion for Summary Judgment that the thrust of Plaintiff's theory is that the City of Lake Ozark had a municipal custom of failing to investigate and discipline officers for their misconduct. The Eighth Circuit in *Mettler* wrote: "Evidence that a police department has failed to investigate previous incidents similar to the incident in question may support a finding that a municipal custom exists, and that such

a custom encourages or allows officers to use excessive force without concern for punishment." *Mettler*, 165 F.3d at 1205.  In *Mettler*, however, the failure to investigate theory fell short because there was no showing that shortcomings in investigations demonstrated a continuing, widespread, persistent pattern of misconduct. *Id.*  Furthermore, the Eighth Circuit could not conclude that, at the time of the shooting which allegedly constituted excessive force, the deputies "believed a municipal custom allowed them to violate [the victim's] rights with impunity" such that the municipal custom not to investigate was the moving force behind the violation. *Id.*

Here, Plaintiff Hinesley claims that neither the Chief of Police, the City Administrator, nor the Board of Aldermen took any action to discipline or correct Officer Braun.  [Doc. # 89 at 29.]  However, Plaintiff alleges only one specific instance in which Officer Braun used excessive force during the time he was employed as a City of Lake Ozark police officer; even then, the incident occurred while Braun acted in his capacity as a reserve deputy for the Miller County Sheriff's Office, not as a City of Lake Ozark police officer.  Thus, Plaintiff has not established that the failure to investigate misconduct at the Lake Ozark Police Department constituted a continuing, widespread, persistent pattern of misconduct.

Even assuming the presence of a continuous, widespread, persistent pattern not to investigate, the fact that the Moniteau County judge found that the force used by Braun was not excessive indicates that the allegation was not fully substantiated.  As in *Mettler*, there is insufficient evidence for a reasonable jury to find that, at the time of Plaintiff's arrest, Officer Braun believed a municipal custom of covering up actual constitutional violations allowed

him to violate Plaintiff's rights with impunity, such that the failure to investigate was the moving force behind the violation. For this reason as well, the Court grants summary judgment with respect to Plaintiff's theories of failures to supervise, control, discipline, or investigate.

### 3. Negligent Hiring or Retention

It appears that Plaintiff Hinesley also asserts a § 1983 claim under negligent hiring and retention theories. For example, Plaintiff argues in her Opposition to Summary Judgment:

> Braun tends to arrest people for no reason and is extremely eager to throw them to the ground, put his knee in their back, and slap handcuffs on them. It is reasonably predictable that Braun would continue to behave in that manner if he was hired as a Lake Ozark Police Officer and given a badge and gun.

[Doc. # 89 at 28.]

The Supreme Court has set forth limited circumstances in which a municipality may be liable under § 1983 for its decision to hire a tortfeasor. In such cases, "there is a particular danger that a municipality will be held liable for an injury not directly caused by a deliberate action not attributable to the municipality itself" because every injury "suffered at the hands of a municipal employee can be traced to a hiring decision in a 'but-for' sense." *Bryan County*, 520 U.S. at 410. Lest municipal liability under § 1983 be reduced to *respondeat superior* liability, the Supreme Court has explained:

> Only where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute deliberate indifference.

*Id.* at 411. "Unlike the risk from a particular glaring omission in a training regimen, the risk

from a single instance of inadequate screening of an applicant's background is not 'obvious' in the abstract; rather, it depends upon the background of the applicant." *Id.* at 410. The *Bryan County* Court cautioned that a finding of culpability cannot depend on the mere probability that any officer inadequately screened will inflict any constitutional injury. "Rather, it must depend on a finding that *this* officer was highly likely to inflict the *particular* injury suffered by the plaintiff." *Id.* at 412. In *Bryan County*, because the plaintiff's primary charges arose from a fight on a college campus when the applicant officer was a student, the Court found the connection inadequate to determine that the sheriff had displayed deliberate indifference. *Id.* at 413.

The Eighth Circuit has interpreted *Bryan County* in light of four subsequent federal circuit court cases. *See Morris v. Crawford County*, 299 F.3d 919 (8th Cir. 2002). According to *Morris*, § 1983 negligent hiring claims "must be closely aligned with a plaintiff's alleged injury, and absent that close nexus, there can be no municipal liability based on a single hiring decision." *Id.* at 924. *Morris* held that "to avoid summary judgment, a plaintiff must point to prior complaints in an applicant's background that are nearly identical to the type of misconduct that causes the constitutional deprivation allegedly suffered by the plaintiff." *Id.* On the facts in *Morris*, the Eighth Circuit noted that although *ex parte* protective orders were obtained by both the ex-wife and girlfriend of the police officer who allegedly used excessive force, those accusations were unsubstantiated. *Id.* at 925. "More importantly, it is the nature of the prior complaints with which we are concerned" because those complaints did not satisfy *Bryan County*'s requirement of a strong connection between the officer's background

and the specific constitutional violation alleged. *Id.*

It could be argued that a single instance of inadequate screening could never trigger municipal liability under § 1983. In *Bryan County*, the Supreme Court declined to rule on this issue. *Bryan County*, 520 U.S. at 412. In the Eighth Circuit, *Mettler* and *Jane Doe A* require "a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees" – in addition to deliberate indifference and a causal connection – to prove the existence of a municipal custom. *Jane Doe A*, 901 F.2d at 646. Nonetheless, the Eighth Circuit has also concluded that § 1983 negligent hiring claims "must be closely aligned with a plaintiff's alleged injury, and absent that close nexus, there can be no municipal liability based on a single hiring decision." *Morris*, 299 F.3d at 924. Therefore, the Eighth Circuit has suggested that where negligent hiring claims are closely aligned with a plaintiff's alleged injury, there could be municipal liability based on a single hiring decision. In *Jones v. James*, the Minnesota district court denied a county's motion for summary judgment on a § 1983 claim based on a single hiring decision. *Jones v. James*, 2005 WL 459652, at *3-4 (D. Minn. Feb. 24, 2005) (holding that a reasonable jury could find that the plainly obvious consequence of hiring a civilian transport officer, against whom allegations of sexual improprieties had been made during his previous employment, would be the deprivation of the plaintiff female inmate's rights).

Thus, the Court must determine whether Plaintiff has pointed to prior complaints in Defendant Braun's background that are nearly identical to the excessive force allegedly used in effecting Plaintiff's arrest. For this alleged municipal custom to rise to the level of

24

deliberate indifference, the Court must also determine that a reasonable jury could find that adequate scrutiny of Officer Braun's background would have led a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire Braun would be the deprivation of Plaintiff's federally protected right to be free from the excessive use of force.

The City of Lake Ozark had received several complaints from the public, coworkers, and the city administration regarding Braun's attitude during the time he worked as a dispatcher from December 2002 until he resigned in October 2004. These complaints would have formed part of Braun's record at the time he applied for a position as police officer with the City of Lake Ozark in 2006. However, these particular complaints are not nearly identical to the excessive force allegedly used by Braun in effecting Plaintiff's arrest. Therefore, they are inadequate to satisfy *Bryan County*'s requirement of a strong connection between Officer Braun's background and the specific constitutional violation alleged by Plaintiff Hinesley.

When Officer Braun applied for a position as a police officer with the City of Lake Ozark in 2006, there had been several complaints regarding his conduct as a police officer for the City of St. Robert from November 2004 until May 2006. First, on May 21, 2005, a formal complaint was filed regarding an incident in which Officer Braun drew a gun on Bradley Shackleford while Shackleford was reaching for his cell phone. Also, in September 2005, a formal complaint was filed against Officer Braun by Jessica Simons, accusing Braun of trespassing at her place of business, Nicole's World of Pets, and using his nightstick to abuse the animals inside. Most relevantly, Jennifer Dupuis filed a formal complaint against Officer Braun, alleging that during a traffic stop on June 19, 2005, Braun threatened to arrest her

because she had not yet provided her identification. According to the formal complaint, Officer Braun then grabbed her hair, yanked her out of the car, and threw her to the ground. The facts alleged in Dupuis's complaint are nearly identical to the Plaintiff's allegations: both women allege that Braun took advantage of the opportunity to arrest them for failure to comply with an order to produce identification by throwing them to the ground and using excessive force in effecting their arrest.

However, Plaintiff has not adduced any evidence – nor has Plaintiff claimed – that the City of Lake Ozark Police Department ever had this portion of Officer Braun's employment history before it when it decided to hire Braun. Given such a lack of evidence, the question becomes whether the City of Lake Ozark adequately scrutinized Braun's background, and, if not, whether such inadequate scrutiny rises to the level of deliberate indifference to Plaintiff's rights. The record does reveal, for example, that the City of Osage Beach Department of Public Safety submitted a questionnaire to the St. Robert Police Department regarding Officer Braun's employment history. [Doc. # 89, Ex. 24 at 13.] It appears, however, that even this level of scrutiny would not have revealed specific details regarding Dupuis's nearly identical complaint. Those details only emerged when Plaintiff's attorney submitted an Authorization to Release Employment Records to the St. Robert Police Department on May 5, 2010. [Doc. # 89, Ex. 24 at 1.] In the ordinary course of business, police departments cannot be expected to undertake the burden of such rigorous background investigations as may occur in the discovery phase of federal litigation. Therefore, while the Dupuis incident constituted a nearly identical complaint, without a showing that the City of

Lake Ozark Police Department knew of the complaint, or that its adequate scrutiny would have revealed the complaint, a reasonable jury could not find deliberate indifference.

Another similar complaint was made after Braun was hired as a police officer at City of Lake Ozark but a month before Plaintiff's arrest. On November 4, 2006, while acting in his capacity as a reserve deputy for the Miller County Sheriff's Office, Officer Braun conducted a traffic stop in the parking lot of the Red Oak Inn. Wes Horton alleges that Officer Braun used excessive force in knocking him to the ground to effect his arrest after he failed to obey Braun's order to go back inside the restaurant. [Doc. # 89, Ex. 9.] Like Plaintiff, Horton also alleges that Officer Braun threw down the paperwork in his hand before charging him and that he received medical attention for his injuries. *Id.* Horton alleges that he met with the City of Lake Ozark Chief of Police to report the incident on the same night of the alleged use of excessive force. *Id.* In connection with these events, Officer Braun was later acquitted of criminal charges by a Moniteau County associate circuit judge, who found that the force used by Braun was not excessive. [Doc. # 82, Ex. J.]

Given the factual findings of the Moniteau County associate judge, the complaint regarding Officer Braun's November 2006 traffic stop was not fully substantiated. While Braun's superiors did know of this complaint, their decision to retain him as a police officer despite the criminal charges did not constitute deliberate indifference. [Doc. # 80, Ex. 2 at 144.] Indeed, their initial impression that the charges were without merit was later confirmed by the Moniteau County judge's explicit finding that the force used by Braun against Horton was not excessive. Therefore, assuming arguendo that the Court found this prior complaint

to be nearly identical, it still could not rise to the level of deliberate indifference.

A reasonable jury could not find that the Defendant City of Lake Ozark should have concluded that Officer Braun's use of excessive force under like circumstances would be a plainly obvious consequence of its hiring decision, or its subsequent retention decision. For this reason, summary judgment is granted with respect to Plaintiff Hinesley's theory of § 1983 liability for the negligent hiring or retention of Officer Braun.

### 4. State Law Battery Claim

Count II of Plaintiff's Complaint names City of Lake Ozark among the defendants to her state law battery claim. [Doc. # 1, ¶ 35.] Under Missouri law, sovereign immunity bars a suit unless the injury alleged arises from operation of a motor vehicle by an agent of a governmental entity, or a dangerous condition on the entity's property. Mo. Rev. Stat. § 537.600. Neither condition is alleged in this case. Furthermore, in Missouri, intentional torts have consistently been found to fall within the shield of sovereign immunity. *Mitchell v. Village of Edmundson*, 891 S.W.2d 848, 850 (Mo. App. 1995).

Plaintiff's Complaint alleges that the City of Lake Ozark waived sovereign immunity by purchasing liability insurance. [Doc. # 1, ¶ 3.] A municipality may waive sovereign immunity by purchasing liability insurance "only to the maximum amount of and only for the purposes covered by such policy of insurance purchased pursuant to the provisions of this section . . . ." Mo. Rev. Stat. § 537.610.1. The mere allegation that Defendant City of Lake Ozark has purchased liability insurance does not, by itself, waive sovereign immunity. Under Missouri law, the plaintiff bears the burden of proving the existence of an insurance policy

waiving sovereign immunity. *Hummel v. St. Charles City R-3 Sch. Dist.*, 114 S.W.3d 282, 284 (Mo. App. 2003). Here, Plaintiff has not carried this burden because she has made only a bare conclusory allegation in her Complaint that Defendant City of Lake Ozark waived its right to assert sovereign immunity by obtaining liability insurance. [Doc. # 1, ¶ 3.] In contrast, Defendant City of Lake Ozark alleges that its policy contains the following clauses, under the heading of "Missouri Municipal Amendatory Endorsement":

> This insurance does not include coverage for any liability or suit for damages which is barred by the doctrines of sovereign, governmental immunity, as set forth in RS MO 537.600, *et. seq.*

> This policy is not intended to act as, nor is it a waiver, of any defense or limitation of damages which is available to an Insured by statute or at common-law.

> For any claim or suit for damages within the scope of RS MO 537.600 to 537.650, the amount of coverage of this policy includes liability only for amounts as set forth in RS MO 537.610.

[Doc. # 80, Ex. I.] The Missouri Court of Appeals in 2008 held that the purchase of a policy containing a similar disclaimer reserving the city's sovereign immunity did not waive the defense of sovereign immunity. *Topps v. City of Country Club Hills*, 272 S.W.3d 409, 417-18 (Mo. App. 2008). The Supreme Court of Missouri also recently ruled that such an "endorsement preserved sovereign immunity under section 537.510.1." *Amick v. Pattonville-Bridgeton Terrace Fire Prot. Distr.*, 91 S.W.3d 603 (Mo. banc 2002); *see also Langley v. Curators of the Univ. of Mo.*, 73 S.W.3d 808, 811 (Mo. App. 2002) ("A public entity does not waive its sovereign immunity by maintaining an insurance policy where that policy includes a provision stating that the policy is not meant to constitute a waiver of sovereign

immunity."). Plaintiff has failed to present any evidence to show that the policy is not as represented by the Defendant City of Lake Ozark. Summary judgment is granted with respect to Plaintiff Hinesley's state law battery claim against the City of Lake Ozark.

## III. Conclusion

Accordingly, it is hereby ORDERED that Defendants Braun and Lloyd's Motion to Strike [Doc. # 90] is GRANTED, Defendant Braun's Motion for Partial Summary Judgment [Doc. # 83] is GRANTED, Defendant Lloyd's Motion for Summary Judgment [Doc. # 79] is GRANTED in part and DENIED in part, and Defendant City of Lake Ozark's Motion for Summary Judgment [Doc. # 81] is GRANTED.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: September 8, 2010
Jefferson City, Missouri